

# NUMBER 13-08-00718-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**CHRISTOPHER ALAN HUGHES,**                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                       **Appellee.**

### On appeal from the 139th District Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Garza
Memorandum Opinion by Chief Justice Valdez**

Following a jury trial, appellant, Christopher Alan Hughes, was convicted of murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003). The jury assessed punishment at forty-five years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice. By two issues, Hughes argues that the evidence

supporting his conviction is legally and factually insufficient.  We affirm.

## I. BACKGROUND

The indictment alleged that Hughes caused the death of his mother, Laura Lee Doyle, by shooting her with a firearm on or about April 20, 2007.[1]  The trial of this matter commenced on August 6, 2008.  The State called numerous witnesses in its case-in-chief, most of whose testimony is summarized below, while Hughes only called two witnesses to testify on his behalf—Randy Langston, Hughes's brother, and Nora Singer, the mother of one of Hughes's friends.

### A.    The State's Evidence

Officer Jorge Elias Ybarra, a police officer with the McAllen Police Department, testified that at approximately 12:51 p.m. on May 5, 2007, he stopped Hughes for disregarding a stop sign.  Hughes was driving a green Chevrolet pickup truck that was registered to "a gentleman named, last name Doyle."[2]  When he approached the truck, Officer Ybarra asked Hughes for his license and proof of insurance.  Hughes stated that he did not have the proof of insurance with him, and he produced a driver's license that was issued to Daniel Doyle but had Hughes's picture pasted over Daniel's picture.  Hughes also stated that he had just left D-Tronics, where he had just purchased a $3,500 stereo system for the truck.  Because Hughes was a minor at the time of the traffic stop, Officer Ybarra inquired as to the whereabouts of Hughes's parents.  Hughes noted that his mother

---

[1] Although he allegedly committed the charged offense while he was a minor, Hughes was charged as an adult and was informed as such at his February 20, 2008 arraignment.

[2] Apparently, the green Chevrolet pickup truck was registered to Daniel Doyle, Hughes's father, who had recently passed away on February 16, 2007.

was on vacation in California; that his father was working in the oil field; and that there was not a way to contact either of them. At this point, Officer Ybarra was suspicious about Hughes's story and his identity, so he asked Hughes to have somebody verify his identity. Hughes provided Officer Ybarra with a phone number for his grandmother, Geraldine Hagens, who lives in San Antonio, Texas. A call to Hagens was made, but she did not answer the phone. Hughes then pointed to his friend, Homero Zepeda, who happened to be driving a gold Chevrolet Impala in the area at the time. Hughes, who was acting nervously at this time, asked Zepeda to tell Officer Ybarra who Hughes was. Officer Ybarra recalled the conversation between Zepeda and Hughes in which Zepeda called Hughes both "Chris" and "Danny," some unknown name. After Zepeda identified Hughes to Officer Ybarra, the boys were allowed to leave because Officer Ybarra was called to assist in a vehicle pursuit that was heading into Hidalgo, Texas.

Marshall Eugene Lewis, an elderly machinist, testified that he first met Laura in February 2007, and that he had last seen her in April 2007. Lewis noted that he and Laura were good friends and later admitted that he was interested in dating Laura even though the two had not been romantically involved. Lewis recalled seeing Hughes driving a "green Avalanche pickup." Lewis, who lived near Hughes, denied ever seeing a yellow Hummer at Laura's residence. On cross-examination, Lewis testified that at the time he first met Laura, she appeared to be suffering from "[s]omething like Lupus or something." Lewis also remembered Laura telling him three or four times that she was worried about stalkers coming onto her property and driving around her mobile home.

Doris Alan, owner of a nearby store and a friend of Laura's, described Laura's property as including a mobile home and a large burnt-out structure close by. The large

3

structure was once the Delta Lake Club House that had fifty-three bedrooms, fifty-three bathrooms, a ballroom, a dining area, and a dance floor, and was once used to entertain people who came to visit the Valley. Alan testified that Daniel owned the entire property and that Laura and Hughes lived at the property with Daniel. Alan recalled that the last time she had seen Laura was around April 26, 2007. Alan testified that she tried to call the residence on several occasions to "[find] out what's going on." When she called, the phone would ring four times and "then this fax machine would come on." Alan stated that she and Laura talked on the telephone frequently, so it was odd that Laura would not answer the telephone. Alan drove by the residence several times and noticed the gate was locked and a car and truck were at the residence. Alan later remembered that Hughes drove the pickup truck on occasion even though Laura did not want Hughes to drive it. Alan also remembered Laura complaining that Hughes had stolen several items from the mobile home, including everything from "jewelry to money, to food, to just all kind[s] of things" and a "money order." Alan noted that Laura "never took any out[-]of[-]town trips" except to Houston, Texas, and that Laura never mentioned having any family or knowing anyone in California. Alan later stated that Laura always took her purse with her wherever she was going.

On cross-examination, Alan recalled an incident where Lewis left Laura a card expressing romantic feelings that Laura did not appreciate. However, Alan emphatically denied that Lewis and Laura were romantically involved, and she did not recall Laura complaining that Lewis may have been stalking her.

Hagens testified that Laura was her daughter and that Laura had three sons, Hughes, Eric Jerome Hughes, and Langston. Hagens further testified that she and Laura

4

talked on the telephone nearly every day. Hagens recalled Laura stating that she had numerous problems with Hughes, including "taking vehicles without permission, you know, just the standard not obeying rules. You know when you're told something you don't—you don't obey, those are mostly what it was."[3] Laura also stated that she was afraid that Hughes "was going to hurt her." Hagens noted that she spoke to Hughes once on the phone while Laura's whereabouts were unknown, and he told Hagens that Laura was asleep and then abruptly hung up the phone. Hagens remembered that Laura always had her purse in her possession and that Laura did not know anyone in California. Hagens testified that Laura loved Hughes very much and would demonstrate her love for her son by buying him "anything he wanted." Hagens stated that Laura and Hughes generally had a good mother-son relationship.

Later, Hagens testified that prior to Laura's death, Hughes repeatedly asked Laura for a sports car; however, Laura told Hughes that she could not afford to buy him a sports car because Daniel had just died and the finances were "very up in the air." Hagens also noted that Daniel's assets passed to Laura upon his death and that Laura had a will designating Hughes as the sole beneficiary.

On cross-examination, Hagens testified that Laura was afraid not only of Hughes but his friends as well. Laura was aware that Hughes and his friends would take her car out joyriding after she had gone to sleep. Hagens recalled an incident where Laura told her that she felt someone push her from behind while Hughes was purportedly asleep in

---

[3] Marcos L. Garcia, a deputy with the Hidalgo County Sheriff's Office, stated that, on April 9, 2007, he responded to two reports pertaining to Hughes—one for unauthorized use of a motor vehicle, namely a Chevrolet pickup truck, and the other for a runaway. Upon arriving at Laura's mobile home, Deputy Garcia spoke with Laura about Hughes. Laura ultimately declined to press charges against Hughes, and Deputy Garcia testified that the truck was recovered six days after the report was made.

5

his bedroom. Laura saw people walk around outside on her property, but she was not sure who had pushed her from behind. Hagens admitted that Laura had a previous conviction for unlawful possession of cocaine and that Hughes had turned Laura in because she was walking on the roof of the mobile home with a pistol in her hand one night while she was high.

Julio Lopez, an investigator with the Hidalgo County Sheriff's Office, testified that, on May 11, 2007, he responded to a welfare call regarding Laura at the family's house in Monte Alto, Texas. Hagens had made the call to police because she had not heard from her daughter, Laura, in several days, and she wanted the police to go to the family's mobile home in Monte Alto to see if Laura was all right. Upon arriving, Investigator Lopez encountered Hughes, who stated that Laura had packed up and left the residence on April 20, 2007. Given these circumstances, Investigator Lopez asked Hughes "how he was maintaining himself," to which Hughes responded, "he [Hughes] was allowed access into his mom's accounts and he would write his own checks." Investigator Lopez described Hughes's demeanor as "[c]alm" and "composed," which seemed to indicate that Hughes was telling the truth. Investigator Lopez then briefly observed the inside of the house. After determining that nothing at the residence appeared to be suspicious, Investigator Lopez instructed Hughes to call Hagens to tell her about Laura's departure and then left. Upon leaving the residence, Investigator Lopez noticed a green pickup truck and a gray Chevrolet Impala.

Langston stated that he had a "semi-close" relationship with Laura and that Hughes is his half-brother. Langston testified that he lives in Victoria, Texas, and that he would visit Laura every few months. Langston recalled that after Daniel passed away, Laura and

6

Hughes were the sole occupants of the Monte Alto mobile home. Langston acknowledged that he is approximately ten years older than Hughes and that, at the time of trial, Hughes was eighteen years old. Langston also admitted that he and Hughes were not very close.

Langston remembered last speaking with Laura in mid-March 2007, and that he was later notified by Hagens that Laura was missing. However, before speaking to Hagens, Langston spoke with Hughes in "late April." When Langston asked where Laura was, Hughes responded that she had gone to California; however, Langston "figured California was a stretch" because Laura did not know anyone in California. When Langston asked Hughes how he was going to care for himself, Hughes stated that he had Laura's credit cards and checkbook and that "he was taking care of the bills and stuff." On May 17, 2007, Langston traveled down to Monte Alto to assist Hughes in taking care of a traffic ticket. Langston arrived in the Valley around 4:00 a.m. on May 17, and proceeded to pick up Hughes from Zepeda's house. Hughes did not go to school that day, and he and Langston then went to Laura's mobile home. Langston followed Hughes back to the house. Hughes was driving a green Chevrolet pickup at the time.

When he arrived at the house, Langston did not recall seeing any bullets or bullet casings on the floor. Langston was aware that Laura kept a "chrome-plated .357" in the house, which was allegedly confiscated when Laura was arrested for cocaine possession. Langston was not aware of any other guns kept in the house. Langston did remember seeing "a few things that didn't look exactly right" when he arrived at the house. Langston noted that it was odd that: (1) Laura had left a fresh pack of cigarettes laying on the coffee table; (2) Laura's driver's license was on the kitchen table; and (3) Hughes had placed Laura's purse in her bedroom. Langston also thought it was odd that the closet door in

7

Laura's bedroom was not chained up, that a plastic bin appeared to have been rummaged through, and that Laura's birth certificate was missing. Langston saw a mop and bucket "midway almost in the kitchen," but it did not appear that the floor had been recently mopped.

Later, Langston, while talking on his cell phone to his uncle during a stroll on the property, discovered what turned out to be Laura's burnt body in some high grass located on the back part of the property, near the burnt-out structure. Upon discovering the body, Langston immediately called Hughes to inquire whether Hughes was involved. Hughes acted like he did not know anything about Laura's body. Langston then called the Hidalgo County Sheriff's Office for assistance. While waiting for the deputies and investigators from the Hidalgo County Sheriff's Office to arrive, Langston took out his digital camera and snapped a few photographs of the body to prove "exactly what [he had] found."

Langston went to the sheriff's office to make two statements regarding the discovery of the body. Hughes then met him at a motel near the house. Langston and Hughes discussed the discovery. Langston recalled Hughes saying, "[t]hat it's pretty messed up" and then they "started into the 1,001 conspiracy theories of how this could have happened." After speaking with Hughes, Langston noticed a small discrepancy in Hughes's story about Laura going to California. Hughes had told Langston that Laura took the Impala to California; however, Langston remembered seeing the Impala at the house on May 18, 2007. Langston noted that Hughes later told him that Laura went to California with someone driving a yellow Hummer. Langston was later questioned regarding Laura's will. Langston denied seeing her will until Hughes showed it to him after the body had been discovered.

8

On cross-examination, Langston testified that Laura had gone on "mini vacations" in the past and that those vacations often resulted in Laura returning inebriated. Langston admitted that Laura was a bit of a "pack rat" and that the purse that was found could have been one of Laura's old purses. Finally, Langston acknowledged that Laura's behavior in the past had been erratic and that he brought bolt cutters to Laura's house because he planned to remove any gun that may have been in the house. On re-direct examination, Langston denied shooting Laura, burning her body, and cleaning up the crime scene afterwards.

Thomas Garza, a patrol supervisor with the Hidalgo County Sheriff's Office, testified that he was the first law enforcement officer to arrive at Laura's residence upon the discovery of a body at the residence at 11:15 a.m. on May 18, 2007. When he arrived, Garza encountered Langston. Langston appeared to be sad and crying and told Garza that he had found a body that he thought was somebody he knew. Langston then showed Garza the body, which had been severely burnt.[4] Garza did not recall smelling anything suspicious at that time. Garza then called for back-up. Investigators Fernando Tanguma, Max Hernandez, and Lieutenant Enrique Enriquez arrived at the scene. On cross-examination, Garza acknowledged that the discovered body was burned so badly that it was unrecognizable. He could not even determine whether the body was male or female.

Ezequiel Jurado III, an investigator in the homicide unit of the Hidalgo County Sheriff's Office, testified that he assisted Investigator Tanguma in the investigation into Laura's death. Investigator Jurado, along with another investigator, went to Economedes High School in Edinburg, Texas, to speak with two persons-of-interest and friends of

---

[4] Garza further testified that the body was "charcoal black" without any hint of skin.

9

Hughes, Raul Arce and Carlos Solis. While speaking with Solis, Investigator Jurado discovered that Hughes had given a gun to Raul's brother, Thomas. Investigator Jurado then obtained a search warrant for the house where the Arces lived. The gun that Hughes allegedly gave to Thomas, a .22-caliber Walter pistol, was found in a "Rubber Maid type plastic laundry bin" in a closet in Thomas's bedroom and was wrapped in a T-shirt. Investigator Jurado also found two magazines for the .22-caliber Walter pistol under Thomas's mattress; however, there were no bullets in the magazines. No other weapons were found in the Arces' house during the search, which was conducted on May 23, 2007. On cross-examination, Investigator Jurado denied knowing that Thomas was a convicted felon at the time of the search of the Arces' house.

Sandra Rangel, a crime scene specialist with the Hidalgo County Sheriff's Office, stated that she was the crime scene specialist who worked on investigating Laura's death. Rangel recalled arriving at the crime scene at 1:45 p.m. on the day the body was discovered. Rangel saw Langston and several investigators at the crime scene that day. She also saw three vehicles parked at the residence that did not belong to the sheriff's office—a gray Chevrolet Impala, a black Chevrolet Tahoe, which belonged to Langston, and a green Chevrolet Silverado Remington Limited Edition pickup truck. Rangel found a small bullet casing—a .22-caliber bullet manufactured by Remington, as evidenced by the "REM" markings on the casing—near the Impala. Rangel also found a white sheet, which appeared to be stained, on the ground on the east side of the mobile home. The sheet was preserved as evidence and sent for testing. Upon further investigation of the property, Rangel found a red gasoline container in the middle of a grassy area near where the body was found. Rangel also recalled seeing a vulture near the body as she

10

approached and that there was wire wrapped loosely around the ankles of the body. Rangel testified that the body was "in the advanced stages of decomposition," but that "the stench was very, very minor due to the open area."

Rangel recorded the investigation on a video camera and also took numerous photographs with a digital camera. Many of the photographs and the videotape of the investigation were admitted into evidence. Rangel also took buccal swabs from Langston to conclusively determine whether the discovered body was Laura's.[5] Rangel collected some of the dirt that surrounded the body to test for accelerants, such as gasoline, that might have been used to ignite the body. The dirt samples tested negative for ignitable liquids.

Rangel subsequently obtained a warrant to search the inside of the mobile home. Upon entering, Rangel saw, among other things, "a box of Remington .22 long rifle ammunition with live rounds," several empty Remington bullet casings throughout the house, and a "yellow-colored mop container like the janitorials [sic] use with a mop and water inside it."[6] Rangel also saw several blood-stained "throw pillows" on the sofa and Laura's purse and driver's license in the house. Rangel collected the "throw pillows," the mop handle, the mop head, and the empty bullet casings and submitted them to crime labs for further testing.[7] Rangel then conducted several field tests on the floor of the house and discovered several small blood stains on the floor. Rangel later testified that she observed

---

[5] Rangel described buccal swabbing as taking "some skin cells from the inside of the cheek area" for subsequent DNA testing.

[6] In fact, Rangel recalled seeing empty bullet casings underneath the sofa, in between the cushions of the sofa, and in the hallway of the house.

[7] With respect to the mop handle, Rangel testified that the crime labs were unable to lift any fingerprints.

the autopsy conducted on the body and was given several projectiles that were extracted from inside the body. These projectiles were submitted for testing. Based on her investigation, Rangel concluded that Laura had been shot six times in the head and then her body had been burned.

On cross-examination, Rangel recalled seeing damage to a fence that surrounded the property. Rangel admitted that she did not find any "drag marks" or blood stains on the side of the property where the white sheet was found or near the location where the body was discovered; however, Rangel noted that, in addition to the blood stains, the white sheet had grass and dirt stains on it. Rangel tested the red gas cans, but no blood or DNA was detected. Rangel acknowledged that no large barrels were found anywhere on the property that could have been used to burn garbage or a human body. Rangel later testified that she did not have the mop bucket tested and that no bullet holes were found in any part of the mobile home. Rangel also admitted that no fingerprints or DNA were found on Laura's purse or on any of the credit cards contained within the purse.

Juan Jose Vasquez, an investigator with the Hidalgo County Sheriff's Office, testified that he assisted in the investigation into Laura's death and recalled finding a "small-looking revolver" in a shed on the property. Jennifer Otto, a forensic scientist with the New Mexico Department of Public Safety, Northern Forensic Laboratory, testified that she received bone fragments obtained from the body and a buccal swab from Langston. Based on her analysis, Otto concluded, with 99.99% certainty, that the body discovered was Langston's biological mother, Laura.

Crystal Kates Dawn Anderson, a forensic scientist at the Texas Department of Public Safety crime lab located in McAllen, Texas, testified that she tested most of the

12

items that Rangel collected from the crime scene. "Apparent blood"[8] was detected on most of the items, including the head of the mop, three of the empty bullet casings, the "throw pillows," and the white sheet. Anderson also detected blood on the left side and inside the barrel of the Walter .22-caliber pistol and on two large sections of the floor of the mobile home. No blood was detected on the trigger area, the grip area, or the right side of the pistol. Anderson testified that Laura could not be excluded as a source of the stains on the "throw pillows" and that Laura's DNA "was included as 15 of the 16 locations that we looked at."[9] Anderson could not match the DNA found on the floor to any known DNA profile.

On cross-examination, Anderson acknowledged that the "apparent blood" found on the left side of the pistol could have been a false positive caused by rust. Anderson admitted that she did not test any hair collected by investigators because investigators did not request that the hair be tested.

Norma Jean Farley, M.D., the chief forensic pathologist for both Hidalgo County and Cameron County, noted that she performed the autopsy on Laura's body on May 18, 2007. Dr. Farley recalled that when the body was brought to the morgue, x-rays were conducted. Dr. Farley noted that the body was "mostly skeletonized" with no skin and it was both "charred and decomposing" at the same time. Dr. Farley was unable to determine the exact time of death because the body had been burned and was exposed to the outdoors

---

[8] Anderson clarified her statements by noting that "[a]pparent [blood] . . . means that our presumptive tests are positive." However, she also noted that "[t]here's other false positives like the strong oxidizing agents [such as bleach] and other heavy metals that would cause a positive result for our presumptive test."

[9] In arriving at this conclusion, Anderson stated that "the probability of selecting an unrelated person at random who could be the source of the DNA profile is approximately 1 in 7.88 quintillion for Caucasians, 1 in 67.48 quintillion for [African-Americans], and 1 in 18.27 quintillion for Hispanic[s]."

for what appeared to be a rather long time.  Dr. Farley found several lead bullets and bullet fragments in the skull and "tiny lead fragments near some of the entrance wounds."  In all, Dr. Farley observed six entrance wounds to Laura's head caused by .22 caliber bullets. Based on her examination of the body, including the entrance and exit wounds, Dr. Farley concluded that the cause of death was "a gunshot wound of head and trunk" and that Laura was shot several times on the top of her head.  A toxicology exam did not reveal any illicit drugs in Laura's system; it only revealed "Tylenol, acetaminophen, and a little bit of caffeine."  Dr. Farley then testified that a gunshot wound to the head would not necessarily cause blood "to be gushing and gushing."  However, the amount of blood ejected as a result of such an injury depends on, among other things, the positioning of the body.[10]

On cross-examination, Dr. Farley admitted that she was unable to determine exactly how Laura's body was positioned when she was shot.  Dr. Farley also admitted that she could not tell how much blood would have gushed from the gunshot wounds because the body was too decomposed, and because she could not determine the positioning of Laura's body when she was shot.

Michael Wayne Hughes, Laura's brother, testified that he and Laura were "pretty close" even though they had not spoken for approximately five years.  Michael works for a drilling company overseas.  Michael recalled that he and Laura had a "falling out" when "[o]ne of her kids was acting up and she didn't want [Michael] disciplining him . . . so

---

[10] In addition, when further asked whether blood would gush from the gunshot wounds, Dr. Farley noted the following:

> Not if the head wound came first because they're already dying or dead by the time they get the second shot.  If the brain controls your heart beating as well as [sic] so when your brain stops functioning then your heart will stop beating.  And that's where your blood is coming from is the heart pumping it through the body.

14

[Michael] asked her to leave." After Laura's body was discovered, Michael spoke to Langston, who informed Michael that he had pictures of the body. Langston and Hughes then went over to Michael's house and showed Michael the pictures of Laura's body. While Langston, Hughes, and Michael were viewing the pictures, Michael observed Hughes exhibit a hateful demeanor that Michael had "never seen before." Hughes then exclaimed, "fucking slut," as he was "hitting the picture [of Laura's body] with his finger." Later, Hughes spoke to Michael about the body and repeatedly referred to the charred body as a female, which made Michael believe that Hughes was aware that the body was Laura's. Michael then heard Hughes state that "they couldn't do nothing [sic] to [Hughes] because [Hughes] didn't have a murder weapon." Hughes also stated that "if anyone was caught for it [the murder of Laura], they would be in prison where no retaliation could be done to them."

On cross-examination, Michael admitted that Hughes was the child who misbehaved and caused Michael and Laura to have a "falling out." In fact, Michael noted that Hughes "has always had a way of getting attention when you're trying to talk or anything else, he'd create some type of mischief." Michael acknowledged that he had no proof that Hughes was involved in Laura's murder, and he stated that Hughes once asked Michael if he "needed anybody hurt" because Hughes would "cover up for a hit and run." Michael then admitted that he had previously given Laura a revolver for protection.

Jeffery Bailey testified that he was an acquaintance of Hughes's and that they used to ride the bus together. Bailey recalled an incident occurring at the end of the 2006-2007 school year, where Hughes brought a gun onto the school bus. Bailey testified that he is familiar with guns and recognized the pistol that Hughes brought on the bus to be a .22-

15

caliber. Hughes allegedly was pointing the gun at others on the school bus and was playing with the gun's magazine. During the investigation of Laura's murder, Bailey was asked to identify from a photo lineup the gun that Hughes brandished on the school bus. Bailey initially identified the wrong gun and was asked by Investigator Tanguma to try again. Bailey subsequently identified the suspected murder weapon from the photo lineup after feeling "pressured" to do so by investigators.

Raul Arce testified that he met Hughes through a friend in 2007. Raul recalled Hughes driving a green pickup truck with an after-market stereo system and neon lighting upgrades. Raul then remembered that he and Hughes once went over to Laura's mobile home to get additional paint balls for their paint-ball guns, and that rather than returning with the paint balls from inside the mobile home, Hughes returned with a .22-caliber pistol. Raul testified that he was certain the gun was a .22-caliber because he is familiar with guns. Raul and Hughes then fired several shots with the gun while outside.

Raul later testified that he saw Hughes hand the gun to Thomas and that he later saw the gun in Thomas's room underneath his mattress. Raul could not recall if Thomas had ever been to Laura's mobile home. Raul did remember telling Solis that Hughes's gun was under the mattress in Thomas's room.

On cross-examination, Raul denied ever seeing Hughes meet with Thomas to buy drugs. Raul could not remember the exact date that Hughes gave Thomas the gun. Raul admitted that Thomas had been to prison "[q]uite a few times." Raul recalled Thomas firing Hughes's gun once at the Arce house and that the boys' mother got upset with Thomas. Raul acknowledged that he had never seen Hughes get aggressive or physically violent with anyone and that Thomas and Laura had met before.

16

Adrian Ramirez, a convicted murderer, testified that he met Hughes while they were both housed in a juvenile detention center in May 2007. Ramirez noted that he and Hughes became friends and that they talked often. Ramirez was aware that Hughes was in the juvenile detention center because he was a suspect in a murder case. When they first met, Hughes denied murdering Laura; however, Hughes later admitted killing her.[11] Hughes also told Ramirez that after he killed Laura, he went to his girlfriend's house with a "whole bunch" of Laura's money. Hughes then told Ramirez that he gave the gun used to shoot Laura to "some guy"; that he cleaned up the mobile home with a mop after he shot Laura; and that his grandmother called repeatedly to ask for Laura, and he told her that Laura "was on vacation somewhere."

On cross-examination, Ramirez admitted that he was on drugs when he made his first statement to police; however, he later stated that he was sober when he talked to police about Hughes's statements. Ramirez testified that Hughes never expressed to him that he took Laura's body out of the barrel that was allegedly used. Ramirez then recalled Hughes stating once that he believed Laura was killed by a drug dealer to whom she owed money. Ramirez denied lying about the statements Hughes made about Laura's murder.

---

[11] Ramirez recalled the following from his conversation with Hughes:

That's when he started letting me know that he had killed his mom because his dad and all that. His dad was dead, something like that. And then that she was—she was treating him all bad and everything so he felt bad. Supposedly, he shot his mom and put her in the barrel, burned her, all kinds of shit.

. . . .

[H]e had said that he had shot his mom in the head and all kinds of stuff when she was asleep and he went to the back and that he had shot her and emptied out another clip on her stomach, I think, and that he had left her there for a minute, and then he had said that he came back and he was kind of scared and then he put her inside a barrel to try to get rid of it, and that he lit the barrel on fire there, and then that he had—he had a truck, he had that—that he had used some money to fix it up and put a system and all kinds of stuff in it.

Max Orlando Cantu, an investigator with Hidalgo County Sheriff's Office, testified that he, along with Investigator Tanguma, interviewed Hughes after Laura's body was discovered. Hughes was calm when confronted by Investigators Tanguma and Cantu. The investigators took Hughes to the juvenile center at the sheriff's office where Hughes gave a written statement regarding his knowledge of the incident. Hughes denied knowing anything about the body and stated that his mother was in California. Hughes admitted to using Laura's checkbooks to pay for food, bills, and other living expenses. He also admitted that he made one large purchase—the stereo system for the green pickup truck. After making his statement the police, Hughes left the sheriff's office with Langston. Investigator Cantu recalled that Hughes did not seem shocked or surprised when told that Laura's body was found on the property where he lived.

Investigator Cantu then noted that he was in the back seat of the police car driven by Investigator Tanguma while Investigator Tanguma was speaking to Ramirez, who was sitting in the passenger seat. On cross-examination, Investigator Cantu stated that he heard Ramirez tell Investigator Tanguma that Hughes admitted to killing Laura; however, Investigator Cantu admitted that he did not hear the entire conversation.

On re-direct examination, Investigator Cantu testified that after Hughes made his statement, he looked Investigator Cantu in the eye and stated, "Catch me, if you can." Investigator Cantu also recounted that Hughes's demeanor during the interview was very cold and that he "was not [fazed] in any way whatsoever that there was a body found on his premises where his mother had been reported missing." However, neither of these observations were included in Investigator Cantu's report.

Solis, a friend of Hughes's, testified that he had been to Laura's mobile home three

18

or four times and, while there, he saw that Laura had a revolver in the house. Solis also testified that Hughes told him that he had a .22 caliber handgun and that he was going to give the gun to Thomas to keep. Hughes did not tell Solis why he was giving Thomas the gun, and Solis stated that he did not see Hughes actually give Thomas the gun. Hughes told Solis that Daniel left the green Chevrolet pickup to him and that Laura was on vacation in California.

On cross-examination, Solis noted that Laura did not appear to fear Hughes and that Hughes was always very respectful towards Laura. Solis testified that he never saw the gun Hughes allegedly gave to Thomas and that Hughes did not tell him the brand name of the gun.

Investigator Tanguma testified that he has worked as a homicide investigator for the Hidalgo County Sheriff's Office for eight years. He was the lead investigator into Laura's death and was at the crime scene on May 18, 2007. Investigator Tanguma observed the burnt body and did not recall any foul odors when he approached the body. Investigator Tanguma also searched the mobile home and noticed that the home had burglar bars and that the home had "a lot of stuff" inside; however, the home did not appear to be ransacked. He did not observe any blood on the floor or any bullet casings, but he did find out from other investigators that there were several guns at the residence. When Hughes came to the sheriff's office to make his statement, officers confiscated several credit cards and checkbooks that Hughes had on his person. Three of the credit cards reflected that Daniel was the cardholder and the other credit card was in Laura's name. Investigator Tanguma discovered that Laura had three different bank accounts and that Hughes was designated as the beneficiary on each of the accounts. In addition, after April 20, 2007,

19

it was discovered that Hughes made several large purchases, which included the purchase of $800 or $900 worth of paint-ball equipment and the D-Tronics stereo system. Apparently, Laura last wrote a check on April 19, 2007, for the purchase of gasoline, medication, and food. Investigator Tanguma denied ever pressuring Bailey to sign the photo lineup of the guns.

On cross-examination, Investigator Tanguma found it odd that Langston took pictures of the body and called several other individuals before calling law enforcement to report the discovery of Laura's body. He also recalled that Langston changed his story twice regarding his discovery of the body. Investigator Tanguma also testified that Laura had made several reports that people were stalking her, stealing from her, and breaking into her house. He also recounted incidents where Laura, while high on cocaine, threw a .22-caliber pistol in a swimming pool and fired a weapon while inside the residence. Investigator Tanguma also noted that, at the time of Laura's death, several financial documents were missing from the trunk of Laura's car and that there was a pending lawsuit between Daniel's family and Laura regarding some investments that Daniel had made prior to his death. Investigator Tanguma later acknowledged that there are no fingerprints, DNA evidence, or blood evidence tying Hughes to the murder of Laura but that he was the most likely suspect in this case because he lived with Laura. No barrels were found on the property.

Perla Rincon, Hughes's girlfriend, stated that Hughes would stay with her every weekend and that Hughes told her that Laura was away in California even though he did not say why. Rincon recalled Hughes driving a green Chevrolet pickup and possessing a gun. On cross-examination, Rincon testified that Hughes had a "[p]retty good" relationship

20

with Laura and that she never saw Hughes get angry or act aggressively towards anyone. Rincon denied defense counsel's insinuation that the gun that Hughes showed her was his paint-ball gun. Zepeda testified that he saw Hughes with a P-22 handgun and that Hughes told him that Laura drove to California in a yellow Hummer and left the Impala at the mobile home. Hughes kept the gun in the center console of the pickup truck, and Zepeda remembered Hughes telling him that he gave the gun to Thomas. Hughes told Zepeda that he stood to inherit over a million dollars from his parents.

Thomas testified that Hughes drove a green Chevrolet pickup truck with "a lot of accessories" like a "[stereo] system, screens, indoor TV, things like that, that nature." Thomas recalled when he retrieved Hughes's gun. Raul and Hughes were playing with their paint-ball guns, and Thomas went to check out the accessories on the pickup truck. Thomas discovered a gun in the truck, so he took it and placed it underneath the seat of a "junked-out" green car on the Arce property. Hughes never came back to claim the gun. Thomas's sister discovered that Thomas had taken the gun from Hughes's truck, and she panicked when law enforcement arrived to search the Arce house and threw the gun in Thomas's closet. Thomas admitted that he had spent six months in a state jail facility for unlawful possession of a controlled substance. Thomas denied ever dealing drugs to Laura and testified that Laura did not owe him any money.

The State subsequently rested its case-in-chief. Hughes moved for a directed verdict, which the trial court denied.

## B. Hughes's Evidence

Hughes re-called Langston to the witness stand. Langston admitted going into Laura's mobile home and recovering some of her personal property after he discovered

21

the body on the property. Langston described several notes that Laura had written regarding "planning scholarships and college tuition," presumably for Hughes's benefit. Langston admitted that he was aware that Daniel was cremated; that his ashes were missing; and that Laura did not believe that Hughes had anything to do with missing ashes. Langston also described a note written by Laura to Raul Ramirez for the installation of a security door and six security windows with burglar bars at the mobile home. Langston was not aware of anyone trying to get some of the money and investments that Daniel had left behind. Langston also collected a telephone that Laura had used. Contained on the phone were voice messages from different collection agencies and from Lewis. All of the voice messages were then played for the jury. Langston testified that he did not think Laura was afraid of Hughes and that Hughes never exhibited aggressive behaviors.

On cross-examination, Langston acknowledged that the voice messages were dated from March 14, 2007 to April 8, 2007, and within that time span, Lewis left nine messages. Langston admitted that Laura found Daniel's ashes in her Impala, yet Langston continued to assert that the ashes had been stolen and placed in the trunk of Laura's car.

Singer, a nurse at DeTar Hospital in Victoria, Texas, testified that she has known Hughes since he was a baby. Singer also testified that she and Laura were friends and that they last spoke in the middle of April 2007. Singer recalled the last conversation she had with Laura and that Laura told her that: (1) Hughes was not dealing well with Daniel's death; (2) Laura was having problems with a lawsuit pending against some of Daniel's family members; and (3) some papers had been stolen from Laura's mobile home. Singer offered to let Hughes come stay with her during the pendency of the lawsuit. Singer testified that Laura was not afraid of Hughes and that Hughes had never been physically

22

violent with Laura, even though the two had arguments, which included "slamming doors, yelling, typical teenager stuff." Singer remembered that Hughes had stayed with her once before while Laura was in jail for cocaine possession. Singer believed that Laura did not want Hughes at the mobile home around the time Laura went missing, which Singer presumed was why Laura entertained the notion of pulling Hughes out of school and letting him stay at Singer's house. Singer noted that Laura was very upset with members of Daniel's family because they allegedly stole papers from the mobile home and transferred large sums of money out of Daniel's accounts prior to his death. Singer later admitted that Daniel, though allegedly on a morphine drip, consented to the transfer of the funds from his accounts to the accounts of his family members.

At the conclusion of the trial, the jury convicted Hughes of first-degree murder and sentenced him to forty-five years' imprisonment. *See id.* Hughes subsequently filed a motion for new trial, which was overruled by operation of law. *See* TEX. R. APP. P. 21.8(a), (c). On September 11, 2008, Hughes filed a motion for judgment nunc pro tunc to request that the final judgment reflect that he receive "jail credit for the time he was incarcerated in Juvenile Detention awaiting a certification hearing." The trial court granted Hughes's nunc pro tunc motion and also certified Hughes's right to appeal.[12] This appeal followed.

## II. STANDARD OF REVIEW

In reviewing the legal sufficiency of the evidence, an appellate court must review all the evidence in the light most favorable to the verdict, and ask whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

---

[12] In its order granting Hughes's nunc pro tunc motion, the trial court awarded Hughes 420 days of jail time credit for time served prior to sentencing.

doubt—not whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)) (emphasis in original). The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Jackson*, 443 U.S. at 318-19; *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for that of the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham*, 29 S.W.3d at 151. We resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In conducting a factual sufficiency review, a court of appeals reviews the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or against the great weight and preponderance of the evidence. *Neal v. State*, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008); *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). Unless the record clearly reveals that a different result is appropriate, we must defer to the fact-finder's determination concerning the weight to be given to contradictory testimony. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

The State is not required to present direct evidence, such as eyewitness testimony, to establish guilt. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). "Circumstantial evidence is as probative as direct evidence in establishing guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*,

214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Guevara*, 152 S.W.3d at 49. The law does not require that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13; *see Guevara*, 152 S.W.3d at 49.

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Grotti v. State*, 273 S.W.3d 273, 280-81 (Tex. Crim. App. 2008); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *see Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). "'Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik*, 953 S.W.2d at 240).

Under the Texas Penal Code, a person commits the offense of murder if he intentionally or knowingly causes the death of another. *See* TEX. PENAL CODE ANN. § 19.02(b)(1). A person acts intentionally "with respect to . . . a result of his conduct when it is his conscious objective or desire to . . . cause the result of his conduct." *Id.* § 6.03(a) (Vernon 2003). A person acts knowingly "with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). Intent may "be inferred from circumstantial evidence[,] such as acts, words, and the conduct of the appellant." *Guevara*, 152 S.W.3d at 50; *see also Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (stating that a fact-finder may infer both knowledge and intent from the defendant's acts, words, or conduct and from the nature of the wounds inflicted on the

25

victim); *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984) (noting that the requisite culpable mental state may also be inferred from the surrounding circumstances).

### III. ANALYSIS

By two issues on appeal, Hughes asserts that the evidence supporting his conviction is legally and factually insufficient. Specifically, Hughes argues that the evidence is legally and factually insufficient because the record does not demonstrate that Hughes, alone, was responsible for Laura's death and that no direct evidence tied Hughes to the killing.[13] Hughes further argues that the State's entire case against him was "riddled with conjecture, speculation, and insinuation." Hughes also disputes the testimony of Ramirez, suggesting that Ramirez was not a credible witness since he was serving a sentence for murder. Hughes finally contends that the evidence is insufficient because several witnesses testified that Hughes never exhibited any violent or abusive behavior and had a good relationship with Laura.

We first note that the court of criminal appeals has held that the State need not present direct evidence to establish guilt; a conviction may be sustained solely on circumstantial evidence. *See Hooper*, 214 S.W.3d at 13; *see also Guevara*, 152 S.W.3d at 49. As Investigator Tanguma noted, there is no direct evidence tying Hughes to the murder of Laura. Thus, we must look to the "cumulative effect of all the incriminating facts" to determine whether the evidence supporting Hughes's conviction is sufficient. *See Hooper*, 214 S.W.3d at 13; *see also Guevara*, 152 S.W.3d at 49.

---

[13] Hughes does not cite any relevant authority holding that the State was required to prove that Hughes, and no one else, was responsible for Laura's murder. *See* TEX. R. APP. P. 38.1(i). In any event, as we conclude below, the evidence in the record supports the jury's verdict that Hughes was responsible for the death of Laura.

In the present case, several witnesses testified that Hughes drove Daniel's green Chevrolet pickup truck often without his parents' consent, and Alan noted that Laura often complained of Hughes taking the truck without permission. Officer Ybarra noted that Hughes created a false driver's license by pasting his picture on Daniel's driver's license and was unable to produce insurance information pertaining to the truck when Hughes was pulled over for disregarding a stop sign. *See Hargrove v. State*, 211 S.W.3d 379, 387 (Tex. App.–San Antonio 2006, pet. ref'd) (stating that giving law enforcement a false name may indicate a consciousness of guilt). Alan testified that Laura complained that Hughes stole several items from her even though Hagens recalled that Laura bought Hughes "anything he wanted." However, Hagens recalled that Hughes repeatedly asked Laura for a sports car, but Laura refused Hughes's requests because the family's financial situation was "very up in the air."

Hughes told several people that Laura had gone to California on vacation, yet several witnesses testified that Laura did not know anyone there. In addition, Hughes initially stated that Laura drove the Impala to California. He later changed his story to state that Laura drove with someone in a yellow Hummer to California even though Alan, Laura's friend who saw her often, denied ever seeing a yellow Hummer at Laura's residence. *See King*, 29 S.W.3d at 565 (concluding that false statements made by a defendant may be evidence of a "consciousness of guilt").

Several witnesses also testified that Hughes possessed a .22 caliber handgun and eventually gave the handgun to Thomas around the same time law enforcement discovered Laura's body. Furthermore, Dr. Farley noted that Laura was shot six times in the head with a gun that shot .22 caliber bullets. Investigators found several empty .22

27

caliber bullet casings around the mobile home. Moreover, investigators also found blood stains on the floor of the mobile home, on "throw pillows," and on the white sheet found on the east side of the mobile home. The white sheet also had dirt and grass stains, which suggests that Laura's body may have been dragged along the ground using the sheet. A red gas can was also found on the property near Laura's body. However, none of the items tested contained DNA evidence directly implicating Hughes with the murder of Laura. Yet, investigators recalled seeing a mop and bucket in the mobile home that the State suggested at trial could have been used to clean up the crime scene after the murder. In fact, Ramirez recounted Hughes's confession that he cleaned up the crime scene with the mop. Moreover, several witnesses noted that only Hughes and Laura lived in the mobile home.

Additionally, and perhaps most damning, Ramirez testified that he spoke with Hughes often while both were incarcerated in a juvenile facility. While talking to Ramirez, Hughes admitted to shooting Laura in the head while she was asleep and burning her corpse. Hughes also told Ramirez that he had a truck and took some money from Laura to outfit the truck with a new stereo system. Officer Ybarra and several of Hughes's friends corroborated Ramirez's testimony by recounting Hughes's use of Daniel's pickup truck and his purchase of a $3,500 stereo system shortly after Laura's murder.[14] Hughes told Langston and others that he was using Laura's credit cards and checkbooks that were obtained from Laura's purse to pay his expenses. Hagens and Alan both testified that Laura never went anywhere without her purse, and Langston, when he visited the mobile

_____

[14] Thomas stated that the green Chevrolet pickup that Hughes was driving had "a lot of accessories" like a "[stereo] system, screens, indoor TV, things like that, that nature." Investigator Tanguma testified that Hughes used his mother's checkbooks to also purchase $800 or $900 worth of paint-ball equipment after her death.

28

home, noticed that Laura's birth certificate was missing; that Laura had left her driver's license even though Hughes stated she was in California; and that Laura's purse was left in the mobile home. Several witnesses stated that, as a result of his parents' deaths, Hughes stood to inherit a substantial amount of money.

While several witnesses testified that Hughes had a good relationship with Laura and always showed her respect, Michael testified that Hughes, when viewing pictures of Laura's body with Michael and Langston, exhibited a hateful demeanor and exclaimed, "fucking slut," while "hitting the picture [of Laura's body] with his finger." Also, Investigator Cantu recalled Hughes stating, "[c]atch me, if you can," when Hughes came to the sheriff's office to make a statement regarding the discovery of Laura's body.

With regard to Hughes's contention regarding the credibility of Ramirez's testimony, we note that it was within the province of the jury to determine the credibility of the witnesses and the weight to be accorded to their testimony. *See Jackson*, 443 U.S. at 318-19; *King*, 29 S.W.3d at 562; *Beckham*, 29 S.W.3d at 151. We also note that Hughes's reliance on testimony that he was non-violent and had a good relationship with Laura to support his argument that the evidence is insufficient is unfounded because Hagens testified that Laura was afraid that Hughes "was going to hurt her." The resolution of Hagens's testimony about Laura's fear of Hughes with the testimony relied upon by Hughes was also within the province of the jury to resolve. *See Lancon*, 253 S.W.3d at 705. The jury clearly believed that Hughes was violent towards Laura, and we must defer to the jury's resolution of the apparently contradictory testimony. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we must presume that the fact[-]finder resolved the conflicts in favor of the prosecution and

therefore defer to that determination."); *Curry*, 30 S.W.3d at 406; *see also Jimenez v. State*, 67 S.W.3d 493, 505 (Tex. App.–Corpus Christi 2002, pet. ref'd) ("The jury exclusively resolves conflicting testimony in the record.").

Reviewing the evidence in the light most favorable to the jury's verdict, we hold that a rational fact-finder could have concluded that, based on the "cumulative effect of all incriminating facts," Hughes intentionally or knowingly caused the death of Laura. *See* TEX. PENAL CODE ANN. § 19.02(b)(1); *see also Jackson*, 443 U.S. at 318-19; *Laster*, 275 S.W.3d at 517; *Hooper*, 214 S.W.3d at 13; *Guevara*, 152 S.W.3d at 49. As such, we conclude that the evidence is legally sufficient to sustain Hughes's conviction. *See Jackson*, 443 U.S. at 318-19; *see also Laster*, 275 S.W.3d at 517. Reviewing the evidence in a neutral light, we cannot say that the evidence is so weak that the jury's verdict is clearly wrong and manifestly unjust or against the great weight and preponderance of the evidence. *See Neal*, 256 S.W.3d at 275; *see also Watson*, 204 S.W.3d at 414-15. Accordingly, we conclude that the evidence is factually sufficient. *See Neal*, 256 S.W.3d at 275; *see also Watson*, 204 S.W.3d at 414-15. We overrule both of Hughes's issues on appeal.

## IV. CONCLUSION

Having overruled both of Hughes's issues, we affirm the judgment of the trial court.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
25th day of August, 2010.